

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-26-2009

# Mahoma Sosa v. Secretary of Departm

Precedential or Non-Precedential: Non-Precedential

Docket No. 08-2191

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Mahoma Sosa v. Secretary of Departm" (2009). *2009 Decisions.* Paper 1680.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1680

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 08-2191

———

MAHOMA SOSA,

*Appellant*

v.

JANET NAPOLITANO,[*] SECRETARY
UNITED STATES DEPARTMENT OF HOMELAND SECURITY

———

On Appeal from the United States District Court
for the District of New Jersey
(Case No. 05-cv-05692)
District Judge:  Honorable Joseph E. Irenas

_____

Argued February 5, 2009

Before: RENDELL and ROTH, *Circuit Judges*, and PADOVA,[**]
*Senior District Judge*.

(Filed: March 26, 2009)

———

[*]Pursuant to Fed. R. App. P. 43(c)(2), Janet Napolitano is substituted for her predecessor, Michael Chertoff, as Secretary of the Department of Homeland Security.

[**]The Honorable John R. Padova, Senior District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Edith Pearce  **[ARGUED]**
The Pearce Law Firm
1601 Sansom Street, Suite 2C
Philadelphia, Pennsylvania 19103

      *Counsel for Appellant*
      *Mahoma Sosa*

Christopher J. Christie
 United States Attorney
Daniel J. Gibbons   **[ARGUED]**
 Assistant United States Attorney
Office of the United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102

      *Counsel for Appellee*
      *Janet Napolitano, Secretary*
      *United States Department of Homeland Security*

_____

OPINION OF THE COURT
_____

PADOVA, *Senior District Judge*.

Mahoma Sosa appeals the order of the United States District Court for the District of New Jersey granting summary judgment in favor of the Secretary of the Department of Homeland Security on Sosa's claim of race, gender and national origin discrimination brought pursuant to Title VII, 42 U.S.C. § 2000e-2.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  We will affirm.

I.

We write exclusively for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis. Sosa was a Federal Air Marshal ("FAM") trainee assigned to the New York Field Office. She had her initial, Phase I, training in Artesia, New Mexico. Following her graduation from Artesia, Sosa was assigned to a training center in Atlantic City, New Jersey for Phase II training from June 23, 2003 until July 25, 2003. She claims that two of the physical training ("PT") instructors at the Atlantic City training center, Mark E. Royer and Serge V. Potapov, constantly harassed her during her training. While Sosa was in Atlantic City, she had training in PT, aircraft tactics ("Tactics"), and firearms.

Sosa failed her initial evaluations in Tactics on July 17, 2003. At the time Sosa trained in Atlantic City, students who failed their initial evaluations in Tactics were given remedial training and re-evaluated by Mitchell Levin, the head of the Tactics program. Sosa was given additional instruction on July 17, 2003 and evaluated on July 18, 2003 by Mitchell Levin. She failed that evaluation as well. Students who failed their evaluations after remedial training were "rolled over" to the next training class and given additional instruction and another opportunity to be evaluated. Sosa was given an additional week of remedial training in Tactics and was evaluated by Levin twice on July 24, 2003. Sosa also failed these evaluations.

Sosa was terminated from the Federal Air Marshal Service on July 31, 2003, because she had failed her Tactics training and, consequently, her Phase II training in Atlantic City. Sosa's termination letter, dated July 31, 2003, was signed by Gerardo J. Spero, Assistant Special Agent In-Charge, and by Feliz J. Jimenez, Special Agent In-Charge, New York Field Office. The letter states the reason for Sosa's termination as follows:

> This is notice that you are being terminated from your position and from the Federal Service effective the date of this letter, because you failed Phase II training in Atlantic City. Specifically, on July 17, 2003, you did not achieve a qualifying score in your Tactics training. You received counseling and remedial training that afternoon and on July 18, 2003, you were re-evaluated, but did not achieve a qualifying score. You were retained for an additional week of training and you were again evaluated on July 24, 2003. During that evaluation you did not achieve a passing score.

App. at 169.

Sosa claims that she was terminated from her position as a FAM trainee as a result of race, gender and national origin discrimination. In support of her claim, she has submitted evidence that she was harassed by Potapov and Royer. Potapov was Sosa's first PT instructor in Atlantic City. He singled her out for abuse when she was last in her class in running, on one occasion saying, in front of others: "'Always behind, always waiting for your freaking ass, I'm tired of this shit.'" Id. at 132. On another occasion, Potapov saw that Sosa was eating a half Philly cheese steak and a diet coke for lunch and told her, in front of others, that "he could not believe after all the exercising and

4

information provided in nutritional classes, that [she] would be eating that kind of 'garbage.'" Id. at 199. He also screamed at her: "'Just get out of my face, you make me sick.'" Id. at 199.

Royer was Sosa's PT instructor during the extra week she spent in Atlantic City for her remedial Tactics training. Potapov told Sosa, in front of Royer, that his grandmother was tougher than Sosa, and stated that he could not understand why she was hired and called her "an embarrassment to the agency." Id. at 200. Royer continued Potapov's harassment of Sosa. Royer told Sosa that "if his family was on a flight that [Sosa] had been assigned to cover as a FAM, he would pull them from the flight and not let his family fly with [her]." Id. He advised Sosa that she should ask for her former job back and informed her that he would not work with her on an aircraft. Royer also humiliated Sosa during her daily runs by running beside her and saying "you're weak, you don't belong here, you know you want to quit, why don't you do us a favor and do it . . . ." Id. at 138, 201. Royer never spoke to other students in that manner and did not harass or harangue male students.

Sosa filed suit against the Secretary of the Department of Homeland Security pursuant to Title VII, alleging that she had been subjected to a hostile work environment and terminated on the basis of her race (Hispanic), national origin (Puerto Rican) and gender (female). The District Court entered summary judgment in favor of the Secretary and against Sosa. The District Court analyzed Sosa's claims under the pretext theory set

forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and concluded that the Secretary was entitled to the entry of summary judgment in her favor because Sosa had not put forth sufficient evidence to establish a prima facie case of discrimination. The District Court further determined that the Secretary would be entitled to the entry of summary judgment in her favor, even if Sosa were able to establish a prima facie case of discrimination, because Sosa had submitted no evidence that the Secretary's proffered reason for her termination was pretextual.

II.

Our review of a grant of summary judgment is plenary. <u>See</u> <u>Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.</u>, 316 F.3d 431, 443 (3d Cir. 2003). In reviewing the decision of the District Court, we assess the record using the same summary judgment standard that guides the district courts. <u>See</u> <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 278 (3d Cir. 2000). To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We "view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences therefrom in that party's favor." <u>New Jersey Transit Corp. v. Harsco Corp.</u>, 497 F.3d 323, 326 (3d Cir. 2007) (citing <u>Horn v. Thoratec Corp.</u>, 376 F.3d 163, 166 (3d Cir. 2004)).

III.

Sosa asks us to find that the District Court erred by utilizing the McDonnell Douglas burden shifting framework to analyze her claim and to determine: (1) that she had not established a prima facie case of discrimination, and (2) that there was no evidence that the stated reason for her termination was pretextual. Sosa contends her Title VII claim should have been analyzed as a mixed-motive claim, rather than as a pretext claim under McDonnell Douglas. "A Title VII plaintiff may state a claim for discrimination under either the pretext theory set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), or the mixed-motive theory set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989), under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons." Makky v. Chertoff, 541 F.3d 205, 213 (3d Cir. 2008).

When the McDonnell Douglas framework is used, "the plaintiff must first establish a prima facie case of discrimination by showing that: (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." Id. at 214 (citing McDonnell Douglas, 411 U.S. at 802; Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc)). If the plaintiff is able to establish

7

a prima facie case of discrimination, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. If the defendant does so, the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for intentional discrimination." Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-08 (1993)).

Congress set forth the standards of proof in a mixed-motive case in the Civil Rights Act of 1991. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 94 (2003) (noting that "§ 107 of the 1991 Act . . . 'responded' to Price Waterhouse by 'setting forth standards applicable in mixed motive cases in two new statutory provisions'" (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 251 (1994))). Under the Civil Rights Act of 1991, a mixed-motive plaintiff may establish an unlawful employment practice by demonstrating "that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). If the plaintiff is able to establish an unlawful employment practice, "the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff. . . . In order to avail itself of the affirmative defense, the employer must 'demonstrate that [it] would have taken the same action in the absence of the impermissible motivating factor.'" Desert Palace, 539 U.S. at 94-95 (quoting 42 U.S.C. § 2000e-5(g)(2)(B)).

Prior to Desert Palace, plaintiffs electing to proceed under the mixed-motive theory were required to present direct evidence of discrimination. See Watson v. SEPTA, 207 F.3d 207, 217-20 (3d Cir. 2000). However, the Supreme Court held in Desert Palace that a plaintiff need not present "direct evidence of discrimination" to proceed on a mixed-motive theory under Title VII. Desert Palace, 539 U.S. at 92 (holding that a plaintiff is not required to present "direct evidence of discrimination in order to obtain a mixed-motive instruction under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991"). Consequently, a plaintiff who has circumstantial evidence of discrimination may choose to proceed under either the mixed-motive theory or the burden shifting framework of McDonnell Douglas. We need not, however, resolve Sosa's contention that the District Court erred by analyzing her claims under the burden shifting framework of McDonnell Douglas rather than under the mixed-motive theory, because she has failed to establish the prima facie case of discrimination required to proceed under either theory and has failed to produce sufficient direct or circumstantial evidence to raise a genuine issue of material fact regarding whether her termination was motivated by her race, national origin or gender.

In order to establish a prima facie case of discrimination under either theory, a plaintiff must establish that she was qualified for the job she sought to obtain or retain. Makky, 541 F.3d at 215 ("We hold today that a mixed-motive plaintiff has failed to establish a prima facie case of a Title VII employment discrimination claim if there is

9

unchallenged objective evidence that s/he did not possess the minimal qualifications for the position plaintiff sought to obtain or retain."). We explained in Makky that mixed-motive plaintiffs are not required to establish "that they were subjectively qualified for their jobs, i.e., performed their jobs well. Rather, we speak only in terms of an absolute minimum requirement of qualification, best characterized in those circumstances that require a license or a similar prerequisite in order to perform the job." Id. at 216.

There is undisputed evidence on the record before us that passing Tactics training was an absolute minimum requirement for the FAM position because, if a trainee failed Tactics, he or she would not pass the training program to be a FAM. Id. at 276. There is also undisputed evidence that Sosa failed Tactics. Id. at 158, 161, 163, 165, 167. A trainee was required to achieve a score of 85 on the Tactics evaluation in order to pass.[1] Sosa was evaluated by two Tactics trainers on July 17, 2003, at the end of her initial week of Tactics training. Christopher Joyner failed Sosa with a score of -5. Robert Williams failed Sosa with a score of 25. Sosa was evaluated by Levin on July 18, 2003, after her remedial Tactics training, and failed with a score of 40. Sosa was evaluated by Levin again on July 24, 2003, after her second week of Tactics training. She failed one of her July 24, 2003 evaluations with a score of 75 and failed the second with a score of 70.

---

[1]Evaluations were scored out of 100 possible points. Deductions were made from 100 for minor violations (a five point deduction) and major violations (a 20 point deduction). Major violations are mistakes made in areas that are considered to be mission critical, i.e., a failure to perform the skill could result in loss of control of the aircraft.

Sosa contends that she was unable to pass Tactics as a result of gender, race and national origin discrimination and that this discrimination was hidden by the subjective nature of the Tactics evaluations. In support of this contention, she claims that a reasonable factfinder, considering the Declaration of Pernille Funk, could have found that she was qualified to retain the position of FAM.

Pernille Funk is the only female FAM instructor permanently assigned to the FAM training center in Atlantic City. Funk reports that, during June and July 2003, there were 16 instructors in Atlantic City, 15 of whom were male. Funk met Sosa while Sosa was training in Atlantic City and acted as her mentor in weapons training and PT. Funk opines in her Declaration that Potapov and Royer harassed Sosa because she is a Hispanic woman. Funk observed Royer and Potapov treat women, African-Americans and Hispanics in a manner that she believes was consistently discriminatory. Moreover, both Royer and Potapov told Funk, prior to Sosa's training in Atlantic City, that "[w]omen do not belong here." App. at 373, ¶ 13. In addition, Sosa told Funk once, during July 2003, that she felt harassed by Royer and Potapov.

Viewing the Funk Declaration in the light most favorable to Sosa, as the non-moving party, it provides evidence that Potapov and Royer engaged in race and gender discrimination. However, the Funk Declaration does not describe any harassing or otherwise discriminatory activity on the part of any of Sosa's Tactics instructors. There is no other admissible evidence on the record before us that links Joyner, Williams or Levin

11

to any discriminatory or harassing activity.[2]

Sosa also claims that Levin was able to hide his discriminatory purpose behind the subjective nature of the Tactics evaluation. Sosa contends that the Tactics evaluations were inherently, and unfairly, subjective because the trainees passed or failed the evaluations based upon whether the instructor saw them perform a required task, enabling a biased instructor to claim that a trainee had failed to perform a required task even though that task had been correctly performed. Sosa has provided only one instance in which she claims Levin was able to use this aspect of the Tactics evaluations to give her a score lower than the score she should have earned. She contends that Levin failed her for neglecting to do a "60" (looking behind and to both sides) when she had completed that requirement. Levin deducted points from Sosa for failing to do a "60" only once, on

---

[2]Sosa contends that there is evidence, ignored by the District Court, that Levin discriminated against other female FAM trainees. This evidence consists of unsworn EEOC complaints filed by two other FAM trainees who failed their Tactics evaluations in Atlantic City, Shelly R. Angelucci and Patricia Diaz-Dragon. Both Angelucci and Diaz-Dragon believe that they were failed in Tactics because of their gender or race and national origin. The District Court considered these complaints, although they were of questionable admissibility, but concluded that they did not create a "triable issue of fact . . . as to whether Levin was motivated by Sosa's gender." Sosa v. Chertoff, Civ. A. No. 05-5692, slip. op. at 10 (D.N.J. Mar. 21, 2008). The Angelucci and Diaz-Dragon complaints are unsworn and, consequently, may not be considered in the context of a Rule 56 motion. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 158 n.17 (1970) (noting that an unsworn statement did "not meet the requirements of Fed. Rule Civ. Proc. 56 (e)"); see also Woloszyn v. County of Lawrence, 396 F.3d 314, 323 (3d Cir. 2005) (stating that the district court properly treated an unsworn affidavit as "not 'sufficient . . . to rely upon . . . in disposing of [a] pending motion for summary judgment'" (citing Adickes, 398 U.S. at 158 n.17)). Consequently, these complaints do not constitute admissible evidence that Levin failed Sosa because of her race, national origin or gender.

12

July 18, 2003. Sosa received a total score of 40 on that evaluation. Consequently, she would have failed that evaluation even if she had been given full credit for performing her "60." We find that this evidence is not sufficient to create a genuine issue of material fact regarding whether Sosa was qualified for the position of FAM.[3]

For the reasons stated above, we find that the District Court did not err in finding that Sosa failed to establish a prima facie case of race, national origin and gender discrimination because the Rule 56 submissions do not contain evidence from which a reasonable factfinder could conclude that Sosa was qualified to retain her position as a FAM.

Sosa also argues that the District Court erred in finding that summary judgment was warranted because she had submitted no evidence that the Secretary's proffered reason for her termination was pretextual. Sosa maintains that the District Court incorrectly used the McDonnell Douglas framework to analyze her claim and that she would have prevailed had it used a mixed-motive framework because the record contains evidence that her race, national origin or gender played a motivating part in the decision

---

[3]Sosa also argues that there is no objective evidence that she failed Tactics because the evaluations contain no explanations of why she lost points for specific violations. She bases her argument on her first July 24, 2003 evaluation, in which she earned a score of 75, her highest score in Tactics. Levin found that Sosa had committed two violations, one major and one minor. The major violation was for "maintaining proper tactical position." App. at 165. The evaluation form explains why Sosa lost points for this major violation, stating that she "did not react to being shot or partner shooting behind her." Id. Consequently, Sosa's first July 24, 2003 evaluation does not support her argument.

13

to terminate her employment as a FAM. Even assuming, *arguendo*, that the District Court erred in finding that Sosa had failed to establish a prima facie case of race, national origin or gender discrimination, we could not find that the District Court erred in granting summary judgment in favor of the Secretary, because the Rule 56 submissions do not contain sufficient evidence to create a genuine issue of material fact regarding whether Sosa's race, national origin or gender played a motivating part in her termination.

Sosa's employment was terminated by Gerardo J. Spero and Feliz J. Jimenez of the New York Field Office. There is no evidence of record that Spero or Jimenez were motivated by Sosa's race, national origin or gender in making the decision to terminate her employment. Sosa's termination letter states that she was terminated because she failed Phase II training, and that she failed Phase II training because she did not achieve a qualifying score in Tactics training. As discussed above, the record contains no evidence that Sosa failed to pass her Tactics evaluations because of her race, national origin or gender. Although the record does contain evidence that Royer and Potapov harassed Sosa on account of her race, national origin and gender, there is no evidence that Royer or Potapov played any role in Sosa's termination. Consequently, we find that the Rule 56 record submissions do not create a genuine issue of material fact regarding whether Sosa was terminated because of her race, national origin or gender.

For the reasons stated above, even applying a mixed-motive analysis, we find that the District Court did not err in granting summary judgment in favor of the Secretary, not

14

only because Sosa did not establish a prima facie case of discrimination, but also because there is no genuine issue of material fact regarding whether her race, national origin or gender was a motivating factor in her termination.

IV.

For the foregoing reasons, we will AFFIRM the judgment of the District Court.

_____